UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH JONES,

                 Plaintiff,              Civil Action No. 14-14484
                                         Honorable George Caram Steeh
                                         Magistrate Judge David R. Grand

v.

J. WIERMAN and
ALFRED JONES,

                 Defendants.

_____/

## REPORT AND RECOMMENDATION TO GRANT DEFENDANT WIERMAN'S MOTION FOR SUMMARY JUDGMENT [25]

This is a prisoner civil rights case brought pursuant to 42 U.S.C. § 1983 by Plaintiff Joseph Jones against Defendant Jennifer Wierman who, as a nurse practitioner, provided medical treatment to Plaintiff Jones during his incarceration.[1] An Order of Reference was entered by District Judge George Caram Steeh on December 3, 2014, referring all pretrial matters to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B). (Doc. #5). Presently before the Court is Defendant Wierman's Motion for Summary Judgment.[2] (Doc. #25). The Court finds that the facts and legal issues are adequately presented in the docket filings, and it declines to order a

---

[1] Plaintiff Jones had also sued Defendant Alfred Jones, who, as an administrative assistant, denied a prison grievance that Plaintiff Jones had submitted regarding his medical care. On June 24, 2016, the undersigned filed a Report and Recommendation to grant Defendant Jones' Motion for Summary Judgment. (Doc. #24). That recommendation was adopted on July 18, 2016, and Defendant Jones was terminated from this case. (Docs. #33, 34).

[2] On July 7, 2016, a letter from Plaintiff Jones was filed in the docket. (Doc. #32). Although he did not specify what it is regarding (or responding to), it appears to be a response to the Court's Order to Show Cause, dated June 24, 2016. (Doc. #31). Here, the Court ordered Jones to file an explanation as to why the Court "should not recommend that his claims against Defendant Wierman be dismissed due to his failure to file a response to her motion for summary judgment." (*Id.* at 1). Alternatively, he could file a response to Wierman's motion. (*Id.*). Jones' response – either to the order or the motion – was due by July 15, 2016. (*Id.* at 2).

hearing at this time.

## I.     RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Defendant Wierman's Motion for Summary Judgment **(Doc. #25)** be **GRANTED**.

## II.    REPORT

### A.     Factual Background

At the time he filed his instant complaint, Plaintiff Jones was incarcerated at the G. Robert Cotton Correctional Facility in Jackson, Michigan ("JCF").  (Doc. #1 at 1, 6).  Jones alleges that before being incarcerated, he had been injured while at work.  (*Id.* at 5-6).  He claims that when he was sent to JCF, he had been prescribed Ultram with Neurontin and that he "was given, this treatment until my MP [medical practitioner] felt that I should not be costing this privet [sic] medical Co., what she turmed [sic], a lot of money."  (*Id.* at 5).  Jones claims that his "reports from all other Dr. that I have seen … state that I need the Medication [i.e., Ultram with Neurontin] to be stable."  (*Id.*).  He alleges that instead of his desired medication, JCF medical staff prescribed him Tylenol to treat his pain.  (*Id.*).

Jones sued Defendant Nurse Practitioner Wierman because she allegedly "has the last word" in terms of what medication he receives.  (*Id.*).  Jones alleges that Wierman "would tell [him] she had placed orders for medication, but never did, after [he] would check.  When [Jones] would ask, she would always say, 'they turned you down.'"  (*Id.* at 16).

#### 1.     *Nurse Practitioner Wierman Provided Medical Treatment to Jones in 2014*

The record evidence establishes that, on January 17, 2014, Nurse Practitioner Wierman "reviewed Mr. Jones's medical chart because several of his medications required renewal."

2

(Doc. #25-2, "Wierman Decl." at 4, ¶ 5[3]; Doc. #27-1 at 4, 8, 10[4]).  At the time, Jones was being given 600 mg of Neurontin, or gabapentin, three times a day, to treat his chronic back pain. (Wierman Decl. at 4, ¶ 5; Record at 1-6, 8, 10).  Neurontin is an anticonvulsant medication that "can induce an altered mental state and is abused in the correctional setting." (Wierman Decl. at 4, ¶ 6).  A nurse practitioner, like Wierman, can only order analgesic medications beyond aspirin, Tylenol, or nonsteroidal anti-inflammatory drugs (NSAIDs) like ibuprofen if they are approved by the Michigan Department of Corrections (MDOC) Pain Management Committee (PMC) for long-term treatment.  (Wierman Decl. at 3, ¶ 4).  According to Wierman, "[t]he PMC's function is to make uniform the practices of prescribing pain medication in MDOC prisons" and it "also seeks to have adequate pain medication prescribed for the medical condition in question." (*Id.*). Still, Wierman can appeal the PMC's recommendations if she disagrees with them.  (*Id.*).

When Wierman reviewed Jones' chart and renewed his medications on January 17, 2014, the "most current" PMC plan she found was from 2008, and it recommended that Jones take 600 mg of Neurontin once a day – not three times a day.  (Wierman Decl. at 4, ¶ 5; Record at 8-10). She "could not locate an indication for a dose of three times a day in the record." (*Id.*).  Chronic pain management plans are supposed to be reviewed annually, so at the time, Jones' PMC papers were "very out[]dated."  (Wierman Decl. at 4, ¶ 5; Record at 8, 10).  As a result, Wierman scheduled to see Jones just ten days later, on January 27, 2014, to carry out a full neurological and musculoskeletal evaluation and possibly submit a new request to the PMC.  (*Id.*).

Before this next appointment, Wierman "obtained an unannounced gabapentin [or Neurontin] level," which MDOC Regional Medical Officer Dr. Borgeriding recommended she

---

[3] The Court will reference Doc. #25-2 as "Wierman Decl. at xx, ¶ xx."

[4] Doc. #27-1, filed under seal, contains Jones' relevant medical records.  The Court will reference them as "Record at xx."

3

do.  (Wierman Decl. at 4, ¶ 6; Record at 5, 18, 108).  Given his prescription, Jones' level should have been between 2.0 and 12.0 mcg/ml, but it was actually less than 1.0 mcg/ml.  (Wierman Decl. at 4, ¶ 6; Record at 108).  According to Wierman, "[t]his indicates that Mr. Jones was not taking Neurontin as prescribed."  (Wierman Decl. at 5, ¶ 6).

On January 27, 2014, Wierman evaluated Jones and found that his back pain (in his lower back) was from years ago, and that it was stable and persistent.  (Wierman Decl. at 5, ¶ 7; Record at 13).  Jones described the pain as "an ache, sharp and throbbing," although Wierman observed that he was in "[n]o acute distress."  (Wierman Decl. at 5, ¶ 7; Record at 13, 15).  Wierman found "no physical abnormality in his back and spine, no kyphosis (hunch back), and no scoliosis (side to side bend of back)."  (Wierman Decl. at 5, ¶ 7; Record at 15).  She noted "posterior tenderness," "[n]o paravertebral spasm," and "bilateral tenderness from [vertebrae levels] L4 to S1."  (*Id.*).  She also noted that he had "[n]ormal flexion … [and] extension," and "full [range of motion], but report[ed] pain with certain movements."  (*Id.*).

Given that Jones' last PMC evaluation was from 2008, Wierman submitted the necessary paperwork to the PMC.  (Wierman Decl. at 5, ¶ 8; Record at 13, 15, 109-14).  Specifically, Wierman "queried whether Neurontin 600 mg three times a day should continue."  (Wierman Decl. at 6, ¶ 8; Record at 109, 113).  She told the PMC that Jones' "prior PMC plan also recommended amitriptyline for pain control," but Jones did not like taking it because it made him "really tired."[5]  (Wierman Decl. at 5-6, ¶ 8; Record at 109, 112-13).  She informed the PMC that Jones reports his pain to be a "4/10" (with Neurontin) and that he "has full [range of motion]" to all extensions and is "able to flex at hips and back without problems."  (Record at 109, 113).  In addition, she included a copy of the gabapentin lab results and of X-ray results

---

[5] Wierman avers that, "[a]mitriptyline is Elavil, a tricyclic antidepressant that has been clinically shown effective for the management of chronic back pain."  (Wierman Decl. at 5-6, ¶ 8).

from October 2011 that "indicated facet joint and arthritic changes in the lumbar spine and degenerative disc change at the L5/S1." (Wierman Decl. at 5-6, ¶ 8; Record at 110).

On February 5, 2014, Dr. Jeffrey Stieve entered the PMC's recommendations, which were the following: (1) offer Tylenol up to 2gm/day (patient may decline); (2) offer formulary NSAIDs of choice up to maximum dose (patient may decline); (3) self-massage, heat, range of motion, and stretching exercises; (4) encourage weight loss; (5) encourage walking up to 20-40 minutes twice a day; and (6) "Neurontin not indicated" (with instructions to wean Jones off the medication). (Wierman Decl. at 6, ¶ 9; Record at 11). Wierman asserts that "[t]his treatment plan is appropriate for management of arthritis and chronic back pain." (Wierman Decl. at 6, ¶ 9). After listing its recommendations, the PMC noted that it reviewed the prior 2008 PMC plan and determined that it was "no longer supported." (Record at 11). Wierman found this "to be expected," given that "[a] patient's condition may improve or decline over time," so "[a] plan that was previously appropriate may no longer be indicated." (Wierman Decl. at 6-7, ¶ 10). Since "new treatment methods are instituted based on current research in the best practices for back pain management," Wierman concluded that the PMC's February 2014 pain management plan "would be based on [Jones'] current symptoms and need" (and not his symptoms and need back in 2008). (*Id.*).

Wierman "agreed with the PMC recommendations," and on February 25, 2014, started weaning Jones off of Neurontin. (Wierman Decl. at 7, ¶ 11; Record at 27-28 (indicating that Neurontin will be "stopped" and "restricted" and ordered in decreasing amounts (from a 600 mg tablet to a 100 mg capsule), with decreasing dosages, until it is "discontinue[d]"), 29 (also indicating that Neurontin will be "stopped" and "restricted" and ordering 400 mg of Neurontin for Jones, for him to take one tab, three times a day, for two weeks, followed by 300 mg and 100

5

mg until it is "discontinue[d]")).  The next day, on February 26, 2014, Jones initiated a request for medical treatment, called a "kite," where he asked to see Wierman "about [his] medication" and mentioned that his next chronic care appointment was in two months.  (Record at 30).  The day after that, on February 27, 2014, Jones initiated another kite, where he talked about his pain situation and asked to remain on Neurontin.  (Wierman Decl. at 7, ¶ 11; Record at 25, 38).  A nurse advised Jones to discuss this with his provider during his next chronic care appointment, and if he was not feeling well, to list his symptoms in a kite and they will "schedule a nurse sick call" for him.  (Record at 25, 30).  She also noted that "[i]t looks like you are still having your Neurontin."  (*Id.* at 25, 38).

On March 19, 2014, Jones initiated yet another kite because he was "[e]xperiencing sharp pin [sic] in [his] back and down [his] left leg," which was "hindering [his] movement."  (*Id.* at 40).  Registered Nurse Cindy L. Murphy noted that a "Nurse Sick Call" was scheduled for evaluation.  (*Id.*).  Less than one week later, on March 24, 2014, Registered Nurse Stephanie A. Smoyer-Barker evaluated Jones for back pain.  (Wierman Decl. at 7, ¶ 12; Record at 34).  His pain's onset date was February 24, 2014, and not the result of a recent injury.  (Record at 34).  Smoyer-Barker noted that Jones' "Neurontin was decreased recently and the pain has since increased."  (*Id.*).  Specifically, Jones stated that his pain was a "3/10" when he was on 500 mg of Neurontin, but now his pain was a "7/10."  (Wierman Decl. at 7, ¶ 12; Record at 34).  Smoyer-Barker noted that Jones had tenderness and tingling in his back and pain with movement.  (*Id.*).  She also noted that he did not have spasms and that his sensation was intact, he had full range of motion, and no weakness, numbness, discoloration, or swelling.  (*Id.*).  She completed heat applications, educated Jones on "non pharmaceutical interventions for comfort," and told him to "sick call if symptoms do not subside or become more severe."  (Wierman Decl. at 7, ¶ 12;

6

Record at 35). A few days later, on March 28, 2014, Jones initiated a kite asking about his pain management situation because his "pain has not gotten better but worse and current med[ication]s are not helping." (Record at 33). In response, Registered Nurse Murphy told Jones he could discuss this with his provider at his upcoming appointment in April and that "in the meantime, [he] will be scheduled to be evaluated by Nursing for [his] pain." (*Id.*). However, Jones did not attend his April 28, 2014 chronic care appointment with Wierman. (Wierman Decl. at 8, ¶ 13; Record at 48-49).

On May 8, 2014, Wierman evaluated Jones "for back pain and several other issues." (Wierman Decl. at 8, ¶ 14; Record at 41-46). Her inspection of his back "reveal[ed] no abnormality," although she noted that he "moves slowly and grimaces with movements [of] flexion, extension, and lateral flexion." (Wierman Decl. at 8, ¶ 14; Record at 43). She also noted that his thoracic and lumbar mobility had decreased and that his spine was "positive for posterior tenderness." (*Id.*). She found bilateral tenderness from C3 to C6 and from L1 to S1. (*Id.*). Still, she found no kyphosis, no scoliosis, and no paravertebral spasm. (*Id.*). She also found that his extremities "appear normal," with no edema or cyanosis, and that his musculature was "normal," with no skeletal tenderness or joint deformity. (Record at 43). Jones told Wierman that he was "upset with the decision that [the] PMC made" to decrease his Neurontin and that since then, "he has not been able to sleep throughout the night and has not been able to exercise like he used to due to his continuous pain." (Wierman Decl. at 8, ¶ 14; Record at 43). Jones stated "that he would sue to get his medications returned." (*Id.*). Although he appeared to be in "no acute distress" (Record at 42) and could ambulate "without assistance" (*Id.* at 44), Wierman had Jones get X-rays[6] "due to [his complaints of] increased pain." (Wierman Decl. at

---

[6] In May 2014, Wierman ordered X-ray exams of Jones' tailbone, neck spine, thoracic spine, and

8, ¶ 15; Record at 43-45).  She encouraged him to "stretch and exercise," "lose weight," and "choose healthy food choices in [the] cafe."  (*Id.*).

On May 13, 2014, numerous X-rays were taken of Jones' sacrum, coccyx, and spine – as ordered by Wierman.  (Record at 53).  On that day, Registered Nurse Patricia F. Faling noted that Jones had discomfort in his lower back, including tenderness and pain with movement (although the same record also notes that Jones denied "any [pain] or discomfort").  (*Id.* at 54).  The results revealed "[n]o acute findings or abnormalities" in his sacrum and coccyx.  (*Id.*).  But the X-rays of his spine showed "[a]rthritic changes," specifically, mild "facet joint arthritic changes throughout the lumbar spine and mild degenerative disc changes at the L4/L5 and L5/S1 levels."  (Wierman Decl. at 8, ¶ 15; Record at 53).  The X-rays also showed "arthritic changes in the vertebral bodies throughout much of the thoracic spine, slightly more advanced in the mid-region," along with "arthritic changes in the vertebral bodies of the C3 to C7 levels (cervical spine)."  (*Id.*).  Moreover, Jones "had osteoarthritis in his back, but no indication of other significant pathology."  (*Id.*).

Wierman avers that osteoarthritis "is the most common form of arthritis" that "occurs when the protective cartilage on the ends of the bones wears down over time."  (Wierman Decl. at 9, ¶ 16).  There is no cure for arthritis; it gradually worsens.  (*Id.*).  However, this progression may be slowed down – and discomfort may be improved – by staying active and maintaining a healthy weight, combined with other treatments such as Tylenol, NSAIDs, and heat and cold treatments (which were provided to Jones).  (*Id.*).  In more severe situations, other treatment options include cortisone injections, lubricating injections, and joint replacement.  (*Id.*).  Even though Jones believed he should receive Neurontin and tramadol (a narcotic medication) for pain

---

lower spine.  (Record at 44-45).  The reason she gave for all of these X-rays was "pain."  (*Id.*).

management, Wierman opines that they "are not usually prescribed for arthritic pain." (*Id.* at ¶ 17). Based on Jones' X-ray results and his ability to function, Wierman found that "the treatment plan established by the PMC appropriately addressed his diagnosis and the objective symptoms he demonstrated." (*Id.*). Thus, "[f]urther analgesic medication was not warranted," and Jones "needed to follow through on complying with the treatment plan, particularly engaging in some physical activity, to reach maximum benefit." (*Id.*).

On June 9, 2014, Wierman reviewed Jones' X-ray results with him. (Wierman Decl. at 9, ¶ 18; Record at 61). At this time, Jones "reported increased back pain since discontinuing the Neurontin." (*Id.*). Wierman also noted that he "moved more slowly across the yard, but was not in distress." (Wierman Decl. at 9, ¶ 18; Record at 61-62). Wierman found that an inspection of his spine (including this thoracic and lumbar curvature) "reveal[ed] no abnormality." (Wierman Decl. at 10, ¶ 18; Record at 62). Although she found posterior tenderness and bilateral tenderness in the thoracic and lumbar regions (L4 to S1), she found no kyphosis, no scoliosis, and no paravertebral spasm. (*Id.*). The straight leg raising test, "used to identify disc herniation," was negative – both with Jones supine and sitting. (*Id.*). And Wierman found "[n]o skeletal tenderness or deformity" and "[n]o cervical spine tenderness." (Record at 62). Instead, Jones' cervical spine showed "[n]ormal mobility and curvature." (*Id.*). Still, she did find that his thoracic and lumbar spine had tenderness and mildly reduced range of motion. (Wierman Decl. at 10, ¶ 18; Record at 62). In addition, she noted no motor weakness and that Jones' balance, gait, and coordination were intact. (Record at 62). Given these findings, Wierman "did not change the course of treatment for managing [Jones'] pain at this time" because it was her professional opinion that if he "complied with the recommendations of the PMC, it would effectively manage his arthritic pain." (Wierman Decl. at 10, ¶ 18). She recommended he take

9

his medications as instructed and increase his activity level and exercise.  (Record at 63).  One

month later, on July 11, 2014, Jones did not attend his appointment with Wierman.  (Wierman

Decl. at 10, ¶ 19; Record at 58-59).

On July 30, 2014, Wierman saw Jones for a chronic care visit.  (Wierman Decl. at 10, ¶

19; Record at 67).  He reported pain that felt like an "ache" in his lower back.  (*Id.*).  He said the

pain, which originated from a motor vehicle accident, "has radiated to the left thigh and right

thigh."  (*Id.*).  Jones reported that his symptoms were "aggravated by extension, flexion and

standing" and "relieved by exercise, movement and over the counter medication [like Tylenol

and naproxen], stretching, and rest."  (*Id.*).  Wierman noted that Jones had back pain and myalgia

(muscle pain).  (Wierman Decl. at 10, ¶ 19; Record at 68).  However, she also noted that his

"compliance with exercise was not good:  [Jones] remained sedentary."  Once again, her

examination of his back "reveal[ed] no abnormality," with no kyphosis, no scoliosis, and no

paravertebral spasm.  (Wierman Decl. at 10, ¶ 18; Record at 68).  She found posterior tenderness

in his spine, but her assessment of his spine's range of motion revealed normal flexion,

extension, and lateral flexion.  (Wierman Decl. at 10-11, ¶ 18; Record at 68).  She noted that

Jones "moved from a standing to seated position without hesitation."  (Wierman Decl. at 11, ¶

19; Record at 68).  She found that Jones "exhibited objective indications of some discomfort,"

but he "functioned well" (Wierman Decl. at 10, ¶ 19) and was in "no acute distress."  (Record at

68).  Therefore, she "continued the same course of care" because she "did not see any indication

that the PMC's current pain management plan was insufficient."  (Wierman Decl. at 10, ¶ 19).

She advised that Jones increase his activity level and exercise (Record at 70) and renewed his

medications, including 325 mg of Tylenol and 500 mg of naproxen, twice a day.  (Wierman

Decl. at 11, ¶ 19; Record at 69, 71).  On September 2, 2014, these continued to be among the

medications Wierman instructed Jones to take.  (Record at 78-79).

On September 29, 2014, Wierman evaluated Jones for other health concerns, in particular, hyperlipidemia.  (Wierman Decl. at 11, ¶ 20; Record at 73-77).  She found that his compliance with diet, exercise, and medication was poor, and noted his "obesity and sedentary lifestyle."  (Record at 73).  Wierman noted that Jones "continued to report back pain," although he had no muscle weakness or myalgia and was in no acute distress.  (Wierman Decl. at 11, ¶ 20; Record at 74).  His back was "non-tender on examination."  (*Id.*).  According to Wierman, she "entered orders related to the hyperlipidemia and encouraged Mr. Jones to continue [to] exercise."  (*Id.*).  She "did not see any indication that the current treatment plan, including medications, was insufficient for his chronic back pain."  (Wierman Decl. at 11, ¶ 20).  This was the last time Wierman evaluated or saw Jones.  (*Id.*).

> 2.  *Physician Assistants Who Subsequently Provided Medical Treatment to Jones in 2014 and 2015 Did Not Alter Nurse Practitioner Wierman's Prior Treatment and, Like Wierman, They Continued to Implement the PMC's Recommendation*

On November 4, 2014, Physician Assistant Mary Boayue evaluated Jones for his hyperlipidemia.  (Wierman Decl. at 11, ¶ 21; Record at 81-83).  Jones reported back pain, bone/joint symptoms, and myalgia.  (Wierman Decl. at 11, ¶ 21; Record at 82).  She found that Jones was in no apparent distress and had no motor weakness.  (Record at 82).  His balance, gait, and coordination were intact.  (*Id.*).  Like Wierman, she encouraged Jones to eat a healthy diet and exercise regularly.  (*Id.*).  And like Wierman, she "did not alter [Jones'] course of treatment for chronic back pain."  (Wierman Decl. at 12, ¶ 21; Record at 82-83).

On December 31, 2014, Registered Nurse Murphy responded to Jones' kite, telling him that Tylenol and naproxen will be on his "list" until they expire or are taken off by his medical practitioner – regardless of whether he takes them or not.  (Wierman Decl. at 12, ¶ 22; Record at

11

84).  She said he can discuss this further at his next visit with his medical practitioner "or if [he] choose[s] to be seen by nursing," she advised him to "rekite with symptoms."  (*Id.*).  Wierman asserts that although he was given these instructions, "Mr. Jones did not kite."  (Wierman Decl. at 12, ¶ 22).

On January 26, 2015, Physician Assistant Aryan Taymour evaluated Jones for his backache and a few other issues.  (Wierman Decl. at 12, ¶ 23; Record at 86-89).  Jones reported a "sharp" pain in his lower back that "radiated to his left foot, left thigh, and left buttock." (Wierman Decl. at 12, ¶ 23; Record at 86).  Jones said it was from a "hard fall" that happened years ago.  (*Id.*).  His symptoms included "numbness, tenderness and weakness" in his leg and arm.  (*Id.*).  Jones reported that these symptoms were "aggravated by sitting and walking" and "relieved by [physical therapy], valium, and Neurontin."  (*Id.*).  Taymour noted that Jones' X-ray from May 2014 "showed [f]acet joint arthritic changes … throughout the lumbar spine" and "[m]ild degenerative disk changes at L4/L5 and L5/S1 levels."  (*Id.*).  He also noted that Jones' compliance with exercise was "poor."  (Wierman Decl. at 12, ¶ 23; Record at 86).

Taymour's physical examination of Jones' lumbar spine showed that his extension and lateral flexion were limited to thirty-five degrees, his flexion was at eighty degrees, and his rotation was at ninety degrees to full capacity.  (Wierman Decl. at 13, ¶ 24; Record at 88). Jones' left and right hips had "active painful[] range of motion."  (*Id.*).  Although Jones had somewhat reduced range of motion in his left and right hips, his "bilateral lower extremity strength [was] normal," and he had "full and equal strength," scoring a "5/5" on both sides.  (*Id.*). Furthermore, his balance and gait were intact.  (Wierman Decl. at 12-13, ¶¶ 23-24; Record at 88).  Taymour "found no indication of neurological issues such as a herniated disc impinging a nerve."  (Wierman Decl. at 13, ¶ 24).  For his backache, he advised that Jones continue taking

12

Tylenol and naproxen as needed for pain (the medical record lists the same amounts as when Wierman treated him – 325 mg of Tylenol and 500 mg of naproxen) and advised stretching and muscle stretching exercises for his back.  (Wierman Decl. at 13, ¶ 24; Record at 87, 89).  Finally, Jones was advised to "[k]ite as needed."  (Record at 89).

On February 10, 2015, Taymour issued a Nutritional Assessment for Jones that indicated that Jones should take 325 mg of Tylenol and 500 mg of naproxen, twice a day, among other medications.  (*Id.* at 85).  Thus, Taymour did not modify Wierman's recommendation from approximately six months earlier.

On April 20, 2015, Taymour saw Jones for his annual visit, where he evaluated him for his backache and a few other conditions.  (Wierman Decl. at 13, ¶ 25; Record at 95-100).  Taymour noted factors such as "obesity," "sedentary lifestyle," and "poor" compliance with exercise.  (Wierman Decl. at 13, ¶ 25; Record at 95).  He also noted "the same history and symptoms" as Jones reported on January 26, for instance, that his pain was "sharp" and located in his lower back, radiating to the "left foot, left thigh and left buttock."  (*Id.*).  Taymour also included the comment about how Jones' previous X-ray indicated "arthritic changes" and "mild degenerative disc changes."  (Record at 95).  A straight leg test resulted in back pain and a lumbar spine evaluation showed "active painful[] range of motion."  (Wierman Decl. at 13, ¶ 25; Record at 96).  Jones' lateral flexion and extension was limited to thirty-five degrees, his flexion was at eighty degrees, and his rotation was ninety degrees to full capacity.  (Record at 96).  His flexion had a "mild restriction," and his extension had "no restriction."  (Wierman Decl. at 13, ¶ 25; Record at 96).  Jones had "active painful[] range of motion" on both his left and right hips.  (*Id.*).  His bilateral lower extremity strength was "normal," once again scoring a "5/5" on both sides.  (Wierman Decl. at 13, ¶ 25; Record at 97).  Like in January, Taymour recommended that

13

Jones treat his back pain by taking Tylenol and naproxen as needed, in the same dosages Wierman recommended.  (Wierman Decl." at 13, ¶ 25; Record at 92, 97).  Taymour continued to advise stretching and muscle stretching exercises and again told Jones to "[k]ite as needed." (*Id.*).  Like Wierman, he recommended that Jones "increase [his] activity level."  (Record at 98).

On July 21, 2015, Taymour issued a medication order for Jones.  (*Id.* at 102).  In this order, he continued to have Jones take 325 mg of Tylenol and 500 mg of naproxen.  (*Id.*).

On July 27, 2015, Taymour evaluated Jones for hypertension and diabetes.  (Wierman Decl. at 14, ¶ 26; Record at 104-07).  Although his diabetes mellitus began in 2001, Taymour noted that "[t]he problem has been getting worse."  (Wierman Decl. at 14, ¶ 26; Record at 104).  He also noted that Jones was "obese," had a "sedentary lifestyle" and, at the time, was "experiencing burning of extremities."  (Record at 104-05).  According to Wierman, this burning sensation was "indicative of diabetic neuropathy."  (Wierman Decl. at 14, ¶ 26).  Along those lines, Taymour found that Jones had bilateral paresthesia in his legs and feet.  (Record at 105).  Still, Jones appeared in "[n]o apparent distress," his extremities "appear[ed] normal," and his balance and gait were "intact."  (Wierman Decl. at 14, ¶ 26; Record at 105).  Like before, Taymour advised Jones to "increase [his] activity level."  (Record at 105-06).  He started Jones on Tegretol, "an anticonvulsant medication similar to Neurontin, to treat the neuralgia (nerve pain) from diabetic neuropathy."  (Wierman Decl. at 14, ¶ 26; Record at 105-06).  But he otherwise "did not alter the pain management plan for [Jones'] chronic back pain."  (Wierman Decl. at 14, ¶ 26).

On August 8, 2015, Jones initiated a kite because "Tegretol [did] not help with pain." (Wierman Decl. at 14, ¶ 26; Record at 101).  Jones said he was "refusing to take Tegretol" because it "causes an irritating effect on him."  (*Id.*).  Jones was told that his medical practitioner

14

was notified and that he should discuss his concerns with him during his next appointment in October 2015.  (Record at 101).

### B.    Defendant Wierman's Motion for Summary Judgment

In her motion, Wierman argues that she is entitled to summary judgment because she "was not deliberately indifferent to [Jones'] serious medical needs as a matter of law."  (Doc. #25 at 21-25).  Specifically, Wierman argues that she was not "deliberately indifferent either when she submitted the request to the PMC or by determining that the 2014 PMC recommendations effectively addressed [Jones'] chronic back pain after the recommendations were instituted."  (*Id.* at 22).

### C.    Standard of Review

Federal Rule of Civil Procedure 56 provides:  "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party.  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  "Once the moving

15

party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).   In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (quoting *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989)).

### D.   Analysis

Reading his complaint generously, Jones appears to allege that Wierman's failure to provide certain medical care violated his Eighth Amendment right to be free from cruel and unusual punishment.   The Eighth Amendment's Cruel and Unusual Punishment Clause prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain" upon inmates.   *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (internal citations omitted). "'Deliberate indifference' by prison officials to an inmate's serious medical needs constitutes 'unnecessary and wanton infliction of pain' in violation of the Eighth Amendment's prohibition against cruel and unusual punishment."   *Miller v. Calhoun Cnty.*, 408 F.3d 803, 812 (6th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

The Sixth Circuit has succinctly explained the standards that a plaintiff must satisfy to state a claim for deliberate indifference to his serious medical needs:

> A claim of deliberate indifference under the Eighth Amendment has both an objective and a subjective component.   The objective component requires the existence of a sufficiently serious medical need.   To satisfy the subjective component, the defendant must possess a "sufficiently culpable state of mind," rising above negligence or even gross negligence and being "tantamount to intent to punish."   Put another way, "[a] prison

16

> official acts with deliberate indifference if he knows of a substantial risk to an inmate's health, yet recklessly disregards the risk by failing to take reasonable measures to abate it." Mere negligence will not suffice. Consequently, allegations of medical malpractice or negligent diagnosis and treatment generally fail to state an Eighth Amendment claim of cruel and unusual punishment.

*Broyles v. Corr. Med. Servs., Inc.*, 478 F. App'x 971, 975 (6th Cir. 2012) (internal citations omitted).

Moreover, a plaintiff must demonstrate that a prison official knew of and disregarded an excessive risk to inmate health or safety by showing that (1) the official was aware of facts from which an inference could be drawn that a substantial risk of serious harm existed, and (2) the official actually drew the inference. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). As the Sixth Circuit has recognized, the requirement that the official subjectively perceived a risk of harm and then disregarded it is "meant to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). The *Comstock* court further explained:

> When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation. On the other hand, a plaintiff need not show that the official acted "for the very purpose of causing harm or with knowledge that harm will result." Instead, "deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk."

(*Id.*) (internal citations omitted). Under these standards, Jones has failed to raise a material question of fact that Wierman was not deliberately indifferent to a serious medical need.

In her declaration, Wierman explains her course of care for Jones. She says that analgesics, like gabapentin and tramadol "are commonly abused medications in the prison system," so "providers must be vigilant [in] dispensing such medications only when medically

indicated." (Wierman Decl. at 14, ¶ 27). She explains that the PMC's recommendation that Jones take several medications and implement conservative treatment such as stretching, exercise, and warm compress is consistent with the "current practice" for treating arthritis and lower back pain (and in her experience, consistent with recommendations the PMC has issued before) because "this maximizes response while minimizing the side effects of high dose medications." (*Id.* at 14-15, ¶ 27). In treating chronic back pain, "[c]urrent medical research has emphasized the importance of non-prescription treatment, particularly exercise, that targets strengthening the core, back, and improving flexibility and posture." (*Id.* at 15, ¶ 27).

Wierman found that the 2014 PMC recommendation was appropriate for numerous reasons: (1) lab tests indicated Jones "was not taking his Neurontin as directed"; (2) objective evidence indicated that the new pain management plan recommended by the PMC gave Jones "sufficient pain management" and was "fully within the standard of care" for his conditions[7]; and (3) Jones "consistently failed to complete one of the most important aspects of his pain management plan – physical activity." (*Id.* at 15-16, ¶ 28). She also could not find any prescription in the record for the dosage of Neurontin Jones had been taking. (Wierman Decl. at 4, ¶ 5; Record at 8-10). Moreover, Wierman asserts that she "did not ignore any risk to Mr. Jones' serious medical needs" and that all of the care she provided "was appropriate and within the standard of care." (Wierman Decl. at 16, ¶ 29). In her medical judgment, the PMC's recommendation appropriately addressed Jones' needs, which did not rise to the level of

---

[7] Wierman avers that the PMC's new pain management plan gave Jones "sufficient pain management" because he was able to move with "minor limitation and perform activities of daily living," "did not visually appear in distress," "only exhibited occasional tenderness to his back and occasional pain at the farthest extent of his [range of motion]," and showed no symptoms of nerve injury. (Wierman Decl. at 15, ¶ 28). Furthermore, Jones' X-rays "showed arthritis and some indication of disc disease," and it is Wierman's medical judgment that the PMC's recommendations were appropriate for treating these conditions, where there was "no indication of more serious dysfunction warranting additional treatment." (*Id.* at 15-16, ¶ 28).

requiring "stronger analgesics such as Neurontin or Ultram (tramadol)."  (*Id.*).  Wierman further asserts that this is supported by "multiple subsequent evaluations" carried out by other medical practitioners, who also did not alter the PMC's recommendation.  (*Id.*; *see supra* at 11-14).

Jones failed to present any evidence to counter that presented by Wierman, and failed to raise a material question of fact that she did not act with deliberate indifference to a serious medical need.  The foregoing shows that, while Jones may disagree with the treatment plan ultimately authorized for him, any such treatment was not the product of deliberate indifference, as Wierman had valid reasons for the actions she took.  The evidence discussed above establishes that Wierman evaluated Jones at least seven times in nine months.[8]  She monitored his condition closely as she implemented the PMC's recommendation and gradually weaned him off Neurontin.  During this time, she responded to his complaints regarding pain, for example, by having him get multiple X-rays done in May 2014.  The results from these X-rays showed that he had osteoarthritis and disc disease, and therefore further confirmed that the PMC's recommendation was appropriate.  Recognizing that he was still in pain, Wierman provided Jones with medications such as Tylenol and naproxen, and recommended that he increase his physical activity as part of his treatment (although Jones failed to comply with this last instruction).  She could have appealed the PMC's recommendation, but she never did because she periodically concluded that it was appropriate for treating Jones' condition – based on his symptoms, X-rays, and physical examinations, which included evaluations such as straight leg tests.

The medical practitioners who followed Wierman also implemented the PMC's

---

[8] The record shows that, in 2014, Wierman evaluated Jones on January 17, January 27, February 25, May 8, June 9, July 30, and September 29.  The number of times she evaluated him would have been higher if Jones had attended his appointments with Wierman on April 28 and July 11.

recommendation to treat Jones.  Physician Assistant Boayue, who evaluated Jones once, and Physician Assistant Taymour, who evaluated Jones for over six months, gave Jones similar medications and instructions as Wierman:  they continued to give him Tylenol and naproxen, while recommending he increase his physical activity.  They did not put Jones back on Neurontin.  And like Wierman, neither of them appealed the PMC's recommendation.

In the face of all of the arguments and evidence presented by Wierman in support of her motion for summary judgment, Jones presented the Court only a short letter, the contents of which failed to meet his burden at the summary judgment stage.  (Doc. #32).  Jones writes that when he got out of prison,[9] he went "to City Medical P.C. for help of the pain I go through every day."  (*Id.* at 1).  He says he saw Certified Physician Assistant Kathy Cooley, who allegedly prescribed Jones Neurontin.  (*Id.*).  First, she prescribed 600 mg of Neurontin, three times a day, but "after 30 days the pain was still hard to deal with so [he] asked her for something stronger." (*Id.*).  He claims that Cooley took X-rays and then gave him 800 mg of Neurontin, even though Jones "did tell her that [he is] a recovering drug addict and [he] didn't what [sic] any pain pills." (*Id.* at 2).  Based on her review of Jones' X-rays, Cooley ordered more tests and told Jones that "she do see [his] problem and it was bad."  (*Id.*).  She also told him that "there was no way that a person who read X-rays wouldn't have seen this."  (*Id.*).

The unsworn, self-serving statements in Jones' two-page handwritten letter do nothing to satisfy his summary judgment burden with respect to his claim of deliberate indifference regarding Wierman's actions when she treated him in 2014.  The Court agrees with Wierman that these statements do not "create an issue of material fact regarding the treatment [she] provided…."  (Doc. #37 at 2).  The Supreme Court and the Sixth Circuit have made clear that

---

[9] According to the Michigan Department of Corrections, Jones was paroled on April 26, 2016. (http://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=139995).

"self-serving and conclusory allegations are insufficient to withstand a motion for summary judgment." *Evans v. Jay Instrument & Specialty Co.*, 889 F. Supp. 302, 310 (S.D. Ohio 1995) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, (1986); *Bryant v. Kentucky,* 490 F.2d 1273 (6th Cir.1974)).   On top of that, Jones has not offered any evidence that Wierman acted with deliberate indifference.   For example, his assertions about Cooley's treatment are not supported by medical records, X-rays, or an affidavit.   With nothing more than self-serving and conclusory statements, Jones has failed to provide the evidence necessary to raise a material question of fact as to whether Wierman acted with deliberate indifference.

But even if Jones had provided evidence to support his allegations, this still would not have indicated deliberate indifference on Wierman's part.   To demonstrate that Wierman was deliberately indifferent, Jones was required to show that she "disregarded a known risk of further harm that might result from the deprivation of medical treatment" for a serious medical condition and that her conduct wasn't just negligent – but "deliberate[] tantamount to intent to punish." *Jennings v. Al-Dabagh*, 275 F. Supp. 2d 863, 870 (E.D. Mich. 2003) (internal citations omitted). As a result, what is relevant to this analysis are the actions of the medical provider during the time in which she was treating the individual.   In this case, Wierman treated Jones in 2014. Wierman's professional judgment that the PMC's recommendation was appropriate for treating his chronic back pain "was based on the status of [Jones'] condition at the time [she] evaluated him" and the evidence that was before her at the time.   (Doc. #37 at 2).   The actions of Cooley, who evaluated Jones two years later and outside of the correctional setting, do not show that Wierman was deliberately indifferent.   For instance, Cooley may have prescribed Jones Neurontin because, in 2016, his condition had worsened.   Or perhaps she is more inclined to prescribe that type of medication because she does not have to worry about it being abused

21

within the prison system.  She may not have been aware (as Wierman was) of Jones' test results which indicated that he had not been taking the Neurontin as prescribed.  (Wierman Decl. at 4, ¶ 6; Record at 108).  In short, in treating Jones, Wierman did not overlook his condition or fail to give him treatment.  On the contrary, she evaluated him regularly and prescribed medication and treatment she believed were suitable, based on her medical judgment and the evidence before her.  Like Cooley did two years later, Wierman obtained X-rays to learn more about Jones' medical needs; she simply chose to treat his condition differently and without Neurontin.  Wierman rightfully points out that "a subsequent treating physician's assistant … decid[ing] [Jones] should receive Neurontin 600 mg three times a day does not contradict [her] opinion." (*Id.*).  Thus, that Wierman and Cooley provided different forms of treatment to Jones at most shows a difference of opinion between two medical professionals and does not raise a material question of fact as to whether Wierman acted with deliberate indifference.  *Yowell v. Booker*, No. 12-10029, 2013 WL 4417417, at *6 (E.D. Mich. Aug. 15, 2013) ("A difference of opinion between medical professionals concerning the appropriate course of treatment generally does not amount to deliberate indifference to serious medical needs."); *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990) ("If a plaintiff's disagreement with a doctor's professional judgment does not state a violation of the Eighth Amendment, then certainly no claim is stated when a *doctor* disagrees with the professional judgment of another doctor.") (emphasis in original).

Similarly, Jones' disagreement with Wierman's medical judgment does not support his deliberate indifferent claim.  The law in this Circuit is clear that mere differences of opinion or disagreements between a prisoner and prison medical staff over the kinds of treatment a prisoner needs do not rise to the level of deliberate indifference.  *See Umbarger v. Corr. Med. Servs.*, 93 F. App'x 734, 736 (6th Cir. 2004).  Courts distinguish between "cases where the complaint

22

alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (internal quotations omitted). While the former cases may evidence the type of culpability required to state a deliberate indifference claim, the latter amount to assertions of medical negligence and do not satisfy the requisite subjective component of such claims. (*Id.*). Indeed, courts have recognized, "[i]n cases where an inmate alleges deliberate indifference but the record demonstrates that the inmate received medical attention and is, in essence, filing suit because he disagrees with certain decisions made by the medical staff, the defendant is entitled to summary judgment." *Allison v. Martin*, 2009 WL 2885088, at *6 (E.D. Mich. Sept. 2, 2009) (internal citations omitted); *see also Umbarger*, 93 F. App'x at 736. That is precisely the case here, where the evidence establishes that Jones received ongoing evaluation and treatment (including medication) for his back pain. While Wierman might not have provided Jones with the exact medication he desired, he has not presented evidence of deliberate indifference on Wierman's part to overcome her summary judgment motion. *See Alspaugh*, 643 F.3d at 169; *Allison*, 2009 WL 2885088, at *6; *Umbarger*, 93 F. App'x at 736.

Accordingly, Wierman is entitled to summary judgment on Jones' Eighth Amendment claim.

### III.    CONCLUSION

For the reasons set forth above, **IT IS RECOMMENDED** that Defendant Wierman's Motion for Summary Judgment **(Doc. #25)** be **GRANTED**.


Dated: September 13, 2016                      s/David R. Grand
Ann Arbor, Michigan                            DAVID R. GRAND
                                               United States Magistrate Judge

23

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 13, 2016.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager